UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EUGENE OLIVER, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:12-CV-01285 (VLB) |
| v. | : | |
| | : | |
| WATERBURY BOARD OF EDUCATION, | : | |
| DENISE DERENCHES, ROBERTA ABELL, | : | |
| CHARLES NAPPI, DAVID SNEAD, and | : | March 24, 2014 |
| RON FROST, | : | |
| Defendants. | : | |

MEMORANDUM OF DECISION GRANTING DEFENDANTS' SECOND MOTION
FOR SUMMARY JUDGMENT SUMMARY JUDGMENT [DKT. 20]

I.      Introduction

The Plaintiff, Eugene Oliver, brings this action against the Defendants,

Waterbury Board of Education, Denise Derenches, Roberta Abell, Charles Nappi,

David Snead, and Ron Frost, for violations of 42 U.S.C. §§ 1981 and 1983 for

discrimination based on race and color as to Defendants Derenches, Abell, Nappi,

Snead, and Frost, violations of 42 U.S.C. §§ 1981 and 1983 for retaliation as to

Defendants Derenches, Abell, Nappi, Snead, and Frost, intentional infliction of

emotional distress as to Defendants Derenches, Abell, and Nappi, negligent

infliction of emotional distress as to Defendant Waterbury Board of Education,

violations of Title VII of the Civil Rights Act of 1964 based on race and color as to

Defendant Waterbury Board of Education, and violations of Title VII of the Civil

Rights Act of 1964 based on retaliation as to Defendant Waterbury Board of

1

Education.  The Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons that follow, the Defendants' motion is GRANTED.

## II.   Background

The Plaintiff, an African-American male, worked as a speech and language pathologist ("SLP") in the Waterbury School District from September 1985 to October 2007 and then again from August 25, 2010 until December 20, 2012.  [Dkt. 22, Defendants' Local Rule 56(a)1 Statement of Undisputed Facts, ¶¶ 1, 2; Dkt. 31, Plaintiff's 56(b) Statement of Disputed Facts, ¶¶ 1, 2].

The Defendants hold various positions in the Waterbury School District. Defendant Snead was (at times relevant to the Plaintiff's Consolidated Complaint (the "Complaint")) the Superintendent of the Waterbury School District.  [Dkt. 22, ¶ 7].  Defendant Derenches is a Special Services Supervisor for the Waterbury School District with supervisory responsibilities for SLPs at various schools within the district, including West Side Middle School.  [*Id.* at ¶ 3].  Defendant Abell is a Special Services Supervisor from the Waterbury School District with programmatic responsibilities for the speech and language pathology program. [*Id.* at ¶ 4].  Defendant Frost was (at all times relevant to the Complaint) the Director of Personnel for the Waterbury School District.  [*Id.* at ¶ 5].  Defendant Nappi was (at times relevant to the Complaint) the Principal of West Side Middle School.  [*Id.* at ¶ 6].

In 2008, the Plaintiff filed a lawsuit against the Waterbury Board of Education and various administrators (including Defendants Frost, Snead and Abell)

2

alleging discrimination based on race under Title VII and a violation of Connecticut's whistleblowing statute. [*Id.* at ¶ 8]. Just prior to the commencement of the suit, the Plaintiff submitted his resignation from his position as an SLP at Crosby High School, claiming that the litigation led to a racially hostile and harassing work environment. [*Id.* at ¶ 8; Dkt. 31, ¶ 8]. During his tenure as a SLP, the Plaintiff received exemplary performance reviews. [Dkt. 31, Plaintiff's Statement of Material Facts (hereinafter "Dkt. 31-1"), ¶ 1].

In the 2008 lawsuit, the jury returned a verdict in favor of the defendants on the Title VII race-discrimination claim, but found in favor of the Plaintiff on the whistleblower-retaliation claim, awarding him $150,000 in compensatory damages. [Dkt. 22, ¶ 9; Dkt. 31, ¶ 9]. The parties entered into a post-litigation agreement (the "Settlement Agreement") to return the Plaintiff to the Waterbury School District as an SLP on or after April 23, 2010 instead of the Plaintiff receiving the damages award. [Dkt. 22, ¶ 10; Dkt. 31, ¶ 10]. The Settlement Agreement, which was signed by the last party on May 18, 2010, specified that the Superintendent was to "hire and enter into a contract with Eugene Oliver as a speech language pathologist and place him in the next available opening in the school system for that position and field." [Dkt. 22, ¶ 13; Dkt. 31, ¶ 13]. A later provision stated that "[a]lthough the parties agree that Mr. Oliver will receive no back pay, he will be employed by the Waterbury Board of Education in a status and with seniority as if he never resigned including but not limited to tenure, all unused accumulated sick time, vacation time, personal time." [Dkt. 33-2, Plaintiff's Exhibit 30, ¶ 4].

3

After an opening for an SLP became available at West Side Middle School, Frost asked his assistant to provide the Plaintiff with a teacher's contract, who, allegedly by mistake or as a result of a misunderstanding, initially provided the Plaintiff with a non-tenured teacher's contract. [Dkt. 22, ¶¶ 11-12; Dkt. 31, ¶ 11]. After the Plaintiff refused to sign the contract, Frost became aware of the issue and remedied the situation by providing the Plaintiff with the appropriate long-term teacher's contract in accordance with the Settlement Agreement (the "Contract"). [Dkt. 22, ¶ 12; Dkt. 31, ¶ 12]. The Plaintiff was assigned to West Side Middle School and signed the Contract on August 24, 2010. [Dkt. 22, ¶ 14; Dkt. 33-2, Plaintiff's Exhibit 31]. At that time, there were two per diem SLPs assigned to Crosby High School. [Dkt. 31, ¶ 14]. Per diem SLPs are not under long-term contracts and have less seniority than tenured SLPs, such as the Plaintiff. [Dkt. 43-1, Defendants' Exhibit 1, Deposition of Eugene Oliver, 23:23-24:9].

Although he signed the Contract, the Plaintiff alleges that the Settlement Agreement required the school district to return him to Crosby High School and that his assignment to West Side Middle School constituted an involuntary transfer, which should then be governed by the applicable Collective Bargaining Agreement. [Dkt. 22, ¶ 15; Dkt. 31, ¶ 15]. Accordingly, on September 22, 2010, the Plaintiff mailed a letter to Snead, telling him that he wanted to be immediately transferred to Crosby High School pursuant to the Settlement Agreement. [Dkt. 43-3, Defendants' Exhibit 14]. Since he was not transferred, the Plaintiff filed a grievance with the relevant union on November 3, 2010, claiming that the superintendent violated the Settlement Agreement by involuntarily transferring

4

him to the middle school, but the union voted against sending the grievance to arbitration on March 26, 2011.  [Dkt. 33-2, Plaintiff's Exhibit 32].

West Side Middle School is a COMMpact school, which is based off a model program run through the University of Connecticut and is designed to "close the achievement gap, create vibrant learning environments" and looks to do so, in part, by involving the entire school community.  [Dkt. 22, ¶¶ 17-18; Dkt. 31, ¶¶ 17-18].  Teachers assigned to a COMMpact school are asked to sign an acknowledgement that they understand the school is a COMMpact school, but they are not asked to sign a document accepting the assignment.  [Dkt. 22, ¶ 19; Dkt. 31, ¶ 19].  Generally, teachers do not have the right to reject an assignment to a COMMpact school or demand a transfer to another school within the school district.  [Dkt. 22, ¶ 20; Dkt. 31, ¶ 20].  That being said, COMMpact schools generally, and West Side Middle School in particular, are not viewed by the Plaintiff as being as prestigious as Crosby High School.  [Dkt. 43-1, Defendants' Exhibit 1, 52:17-53:18].  So, the Plaintiff "did not want to be at West Side Middle School" as he thought it was below his tenure.  [*Id.* at 23:6-7].

After the Plaintiff started at West Side Middle School, several issues began to arise.  First, the Plaintiff was unhappy with his assigned office space, alleging that it was an old storage closet with inadequate furniture and storage space and had exposed wiring.  [Dkt. 22, ¶ 41; Dkt. 31, ¶ 41].  After complaining to the administration, he was moved to a different office space.  [Dkt. 22, ¶ 41; Dkt. 31, ¶ 41].  However, prior to the 2010-2011 school year, the Plaintiff's original office space, his alleged storage closet, had been used by a Caucasian SLP and was

5

part of a suite of interconnected work spaces traditionally used by the SLPs. [Dkt. 22, ¶ 42].

Another issue was related to the rotation schedule at the school.  Structurally, West Side Middle School is split up into three houses: the Gold House, the Blue House, and the Red House, with each House having its own principal, vice principal, office and secretarial staff.  [Dkt. 22, ¶ 21; Dkt. 31, ¶ 21].  The school is on a rotating schedule whereupon at specific times during the school year, there is a schedule change or rotation between the houses that would alter individual students' daily schedules.  During the 2010-2011 school year, copies of the rotation schedule were posted in the main office, as well as posted in all house offices.  [Dkt. 22, ¶¶ 22-23; Dkt. 31, ¶¶ 22-23; Dkt 43-3, Defendants' Exhibit 6, Affidavit of Maria Burns, ¶ 10].  Derenches averred that she reminds administrators and staff when a new rotation is about to begin in an effort to effectuate a smooth transition into the new schedule.  [Dkt. 43-1, Defendants' Exhibit 2, Deposition of Denise Derenches dated July 31, 2012, 45:2-5].  The Plaintiff, however, denies receiving any reminder of a new rotation schedule, and claims to have not become aware of the rotation until after the first rotation occurred.  [Dkt. 21 ¶ 25; Dkt. 31, ¶ 25; Dkt. 32, Affidavit of Eugene Oliver, ¶ 10]. Indeed, on December 14, 2010, the Plaintiff wrote to Derenches and others requesting a complete list of rotation schedules because "the schedules [he] downloaded . . . didn't indicate this rotation schedule change.  [They] neglected to provide this pertinent information."  [Dkt. 33-2, Plaintiff's Exhibit 40].  After the first rotation, which appears to have been in December, the Plaintiff emailed

6

principal Nappi on February 5, 2011 asking for "a copy of the annual rotating schedule and all other pertinent data required for scheduling my caseload." [Dkt. 33-3, Plaintiff's Exhibit 42]. Nappi responded by stating that "this schedule is not unique to west side, … all 3 middle schools are on the same schedule, … what are you referring to when you say rotating?  I suggest you ask Mrs. Burns or talk to any of your speech and language peers for further clarification to your request." [*Id.*].  There is no indication that the Plaintiff ever spoke with any of his peers or Mrs. Burns regarding the rotation schedules.

A third issue that developed was related to the computer software used by the school and the SLPs for record keeping purposes.  During the 2010-2011 school year, a program named AS400 was used by the school district to store student information; however, no SLP was given access to the program at West Side Middle School, only the house secretaries, the house principals and the school principal had access to the program.  [Dkt. 43-1, Defendants' Exhibit 2, 28:5-18]. After having substantial difficulty in scheduling his students for services, the Plaintiff independently asked a house secretary for access to the program.  He also openly admitted that Derenches could have assisted him in scheduling his caseload if she had gotten him "access to AS400." [Dkt. 43-1, Defendants' Exhibit 1, 40:7-10].  At some point in the fall of 2010, he was given access to the program, but his issues with scheduling his course load persisted.  [Dkt. 22, ¶ 27; Dkt. 31, ¶ 27].

Another web-based program used by the Waterbury Department of Education to manage Individualized Education Plans ("IEPs") for special education students

7

within the school district is called TIENET.  [Dkt. 22, ¶ 28; Dkt. 31, ¶ 28].  TIENET
is used by special education teachers including SLPs to manage their caseloads
and maintain and update their student's IEPs.  [Dkt. 22, ¶ 29; Dkt. 31, ¶ 29].  IEPs
are legally binding and statutorily mandated individualized education plans
designed to meet the needs of students with special needs. They set forth
specific components and timeframes for services for individual students
necessary to meet their needs and comply with the state and federal law.  [Dkt.
31, ¶ 38; Dkt. 22, ¶ 38].  Data collected from IEPs and the services provided to
eligible students helps provide funding for special education programs within the
school district.  [Dkt. 22, ¶ 39; Dkt. 31, ¶ 39].  When students are out of
compliance with their IEP requirements, the Waterbury School District is at risk
for a compliance audit by the State Department of Education, a fine, or having
funding revoked.  [Dkt. 22, ¶ 40; Dkt. 31, ¶ 40].  TIENET, therefore, was used to
streamline and organize the IEP process.  The Plaintiff alleges that he did not
have the same ability to create, edit, and update documents in TIENET as other
Caucasian SLPs and continually experienced technical problems with the
program.  [Dkt. 31, ¶¶ 30-32].  However, the Defendants have offered logs and
other evidence that show that the Plaintiff had the same security profile as all
other SLPs at West Side Middle School, and was in fact able to log on to the
system and did so regularly from August 31, 2010 until the date of his
termination.  [Dkt. 43-2, Defendants' Exhibit 5, Affidavit of Dunia Rodrigues, ¶¶ 8-
14; Dkt. 31, ¶ 30].  Regardless, the Plaintiff continues to allege that he continued
to have incredible difficulty with the system, including difficulty saving and

8

uploading certain documents.  [Dkt. 32, ¶¶ 11-12].  On November 24, 2010, in response to the Plaintiff's requests, or allegations, Derenches reviewed the TIENET program with him, evidently step-by-step, and assured that he was able to log into the system and perform necessary functions.  [Dkt. 43-3, Defendants' Exhibit 11].  She also wrote for him a set of instructions for how to properly log on to TIENET.  [Dkt. 33-2, Plaintiff's Exhibit 37].  Moreover, the Plaintiff's own diary shows that he attended TIENET orientation training sessions on September 13 and 14, 2010.  [Dkt. 33-2, Plaintiff's Exhibit 41].  Derenches averred that after the November 24, 2010 session, the Plaintiff was able to access the TIENET system at school, but was still having trouble accessing the program remotely from his home computer.  [Dkt. 43-1, Defendants' Exhibit 2, 29:5-38:7].  Even so, the Plaintiff alleges without evidentiary support that throughout his time at West Side Middle School, his TIENET access was restricted.

Finally, as alluded to above, the Plaintiff experienced issues with creating a master student services schedule.  The Plaintiff alleges that he was never given his students' individual schedules, unlike his Caucasian peers, nor was he given a complete employee directory.  However, the Plaintiff admits that when he asked Derenches and Abell about obtaining his students' schedules, he was told to "see the building principals."  [Dkt. 43-1, Defendants' Exhibit 1, 39:12-18].  Conversely, Derenches avers that she told the Plaintiff on several occasions how to get schedules, i.e. from the individual house offices.  [Dkt. 43-1, Defendants' Exhibit 2, 25:21-26:1].  In fact, the Plaintiff admits that he went to the various offices and talked with the secretaries about obtaining the schedules, but was only given one

9

of the house's schedules.  [*Id.* at 32:15-25].  The Plaintiff averred that he did not know how the other SLPs obtained student schedules, but believed, albeit incorrectly, it was because they had access to the AS400 program.  [*Id.* at 39:22-40:2].  In reality, the individual SLPs were required to go to the individual houses to obtain the schedules and create their own master schedule themselves.  [Dkt. 43-1, Defendants' Exhibit 2, 24:4-18].  Even though the Plaintiff admitted he knew how to obtain the schedules, he oddly and repeatedly asked the Defendants to provide the schedules to him.  In one response dated September 29, 2010, Nappi stated "have no idea what your [sic] talking about getting a schedule? Teachers, speech, all get their own schedules."  [Dkt. 33-3, Plaintiff's Exhibit 42].  Indeed, other evidence has been submitted showing that the Plaintiff had been informed how to obtain student schedules.  A teacher, Lori Ditillo, emailed the Plaintiff on October 12, 2010, stating that, as related to her students who needed services, "[y]ou told me that you did not have their schedules.  I explained that they do not come from the elementary school with schedules and that all of the students can be located in the room we were in . . ., or in the surrounding rooms, during periods 1-5.  I also suggested that you come to any of the red house sixth grade teachers & we can tell you which room your students are in at the time."  [Dkt. 43-3, Defendants' Exhibit 10].  Furthermore, on December 22, 2010, another teacher, Louise Pesce, put a copy of her students' schedules in the Plaintiff's mailbox, which detailed the then current schedule and the second rotation schedule.  [Dkt. 43-3, Defendants' Exhibit 12].  Given this, Derenches did not understand why the

10

Plaintiff would have had trouble obtaining the schedules unless "he didn't ask for" them. [Dkt. 43-1, Defendants' Exhibit 2, 25:11-19].

These issues resulted in several performance-related problems. The Defendants allege that the Plaintiff failed to schedule his students' for therapy and testing during the fall of 2010 which put many, if not all, of his students out of compliance with their individual IEPs. [Dkt. 43-1, Defendants' Exhibit 2, 70:5-21; Dkt. 43-3, Defendants' Exhibit 10; Dkt. 43-3, Defendants' Exhibit 12]. Derenches further avers that during this time, several teachers approached her with concerns that the Plaintiff was not performing his SLP responsibilities for their students. [Dkt. 43-1, Defendants' Exhibit 2, 85:11-17]. The Plaintiff confirmed this by admitting that some of his students were out of compliance with their IEP requirements. [Dkt. 43-1, Defendants' Exhibit 1, 69:7-16]. However, the Plaintiff alleges that his failure to perform his duties was directly caused by the issues described above, which he alleges the Defendants fabricated purposefully. [*Id.* at 69:17-24]. Since the Plaintiff did not timely complete a schedule or routinely test his students, on October 14, 2010, Derenches asked Anne Marie Cullinan, Assistant Superintendent and former SLP, to create a master schedule for him. [Dkt. 22, ¶ 43; Dkt. 33-2, Plaintiff's Exhibit 41]. After the schedule was complete, however, the Plaintiff alleges it was inaccurate, requiring him to substantially revise it. [Dkt. 32, ¶ 26].

During the fall of 2010, the parties admit that the Plaintiff was subject to several pre-disciplinary and disciplinary meetings regarding his performance, which ultimately culminated in a five day unpaid suspension in December 2010.

11

[Dkt. 43-3, Defendants' Exhibit 9; Dkt. 33-2, Plaintiff's Exhibit 41; Dkt. 22, ¶ 45; Dkt. 31, ¶ 45].  The Plaintiff alleges that no other Caucasian SLP received such harsh disciplinary action.  However, the Defendants averred that a Caucasian SLP received a five day suspension on March 3, 2010 for failure to provide speech and language services and perform the functions of an SLP.  [Dkt. 21, ¶ 46; Dkt. 31, ¶ 46; Defendants' Exhibit 4, Affidavit of Ron Frost, ¶ 17].

The Plaintiff also alleges that in most of his interactions with Derenches, she berated him in a hostile manner.  [Dkt. 32, ¶ 30].  The Plaintiff, however, only alleged one specific incident where Derenches was allegedly rude.  Once, he recalled, Derenches insisted that he stop the work he was then performing, testing and interviewing a student, in order to attend a meeting with her.  [*Id.* at ¶ 36].  After leaving the student, however, the Plaintiff learned that the meeting with Derenches was not going forward.  [*Id.*].  He alleged that the tone she took with him in front of the student was belittling and undermined his authority position. The remaining claims are merely that she was rude and hostile, but no specific events are described.  Derenches, on the other hand, recalled that the Plaintiff specifically called her a disgusting person to her face at one point.  [Dkt. 43-1, Defendants' Exhibit 2, 79:1-3].

Even after the five day suspension, the Plaintiff's behavior still seemed to be an issue.  In February 2011, a Planning and Placement Team ("PPT") was held in which the Defendants allege that the Plaintiff said at the meeting that due to his pending lawsuit against the City of Waterbury, he was unable to complete the assigned tasks to assess and implement the IEP.  [Dkt. 43-3, Defendants' Exhibit

12

10].  Given the date of that PPT, the lawsuit referenced seems to have been the current action.  The Plaintiff contests the Defendants' characterization of the PPT and said that even though he told the parent she might want to read some background information about his discrimination suit against the school district, he was prepared for the PPT.  [Dkt. 33-2, Plaintiff's Exhibit 41].  Regardless, the Plaintiff was verbally reprimanded for his comment regarding the pending litigation and for his lack of preparation for the meeting.

At the beginning of the 2011-2012 school year, the Plaintiff bid on an open SLP position at Crosby High School and was awarded a transfer.  [Dkt. 22, ¶ 48; Dkt. 31, ¶ 48].  Even though no other SLP requested the transfer at the open meeting, the Plaintiff "was kept in suspense for several minutes while [his] supervisor decided whether anyone else wanted it."  [Dkt. 43-1, Defendants' Exhibit 1, 58:18-22].  Yet, the Plaintiff admits that the assignment followed the appropriate protocol.  [*Id.* 76:20-22].

After the transfer, the Plaintiff's performance issues persisted.  In October 2011, for example, a teacher at Crosby High School, Lisa Brown, emailed the Plaintiff stating that "[y]esterday you verified verbally to me that you did not see any of the students on your caseload for the morning, due to testing a student and preparations.  You built a daily preparation and testing period into your schedule.  For you not to see the scheduled students is unacceptable.  As a result six students yesterday morning did not get services that are listed in the IEP.  This is unacceptable."  [Dkt. 43-4, Defendants' Exhibit 20].  The same teacher sent other emails throughout the month of October expressing similar

**13**

concerns.  [*Id.*].  In response to these issues, Abell requested a daily log, which the Plaintiff supplied "[u]nder extreme duress" as he viewed the request as one in a pattern of "harassment, retaliation and violation of" his civil rights.  [Dkt. 43-4, Defendants' Exhibit 15].  The Plaintiff does not dispute his performance issues, but alleges they stemmed from the same discriminatory and harassing behavior that he had experienced since returning to the school district.  While at Crosby High School, he still complained of experiencing technical problems with TIENET. In November 2011, the Plaintiff and his wife called the manufacturer of TIENET to inquire about his problems.  When the school discovered this, however, a letter from the City of Waterbury was sent to the Plaintiff's wife stating that she "cannot assist [her] husband to the extent it requires [her] to view confidential student records."  [Dkt. 33-4, Plaintiff's Exhibit 62].  The Plaintiff viewed this as the school chastising him for attempting to resolve his technological issues.

On February 27, 2012, the Superintendent sent a letter to the Plaintiff notifying him that termination of his employment was under consideration pursuant to the Teacher Tenure Act and provided the Plaintiff with the opportunity to request the reasons that termination was being considered.  [Dkt. 21, ¶ 49; Dkt. 31, ¶ 49; Dkt. 43-3, Defendants' Exhibit 8].  The Plaintiff was placed on paid administrative leave on that date, and a hearing pursuant to the Teacher Tenure Act took place before an impartial arbiter on November 13, 2012.  [Dkt. 21, ¶ 50; Dkt. 31, ¶ 50].  The impartial arbiter recommended termination of the Plaintiff's contract, and on December 20, 2012, the Waterbury Board of Education voted to terminate the

Plaintiff's employment.  [Dkt. 21, ¶ 51; Dkt. 31, ¶ 51, Dkt. 43-4, Defendants' Exhibit 19].

The Plaintiff alleges that these facts and events show that the Defendants permitted him to return to the district so that a proper paper trail could be developed for his termination.  [Dkt. 31-1, ¶ 15-16].  As an important fact, he notes that in every meeting he had with Derenches, a witness was always present.  [Dkt. 32, ¶ 30].  He also alleges that the hostility between the parties caused him serious medical issues.  In fact, his absence reports show that out of the 299 work days between September 2010 and February 2012, he was absent 127 days, or roughly 42.4% of the school days, with 37 of those absences occurring between September 2010 and January 31, 2011.  [Dkt. 43-3, Defendants' Exhibit 17; Dkt. 33-4, Plaintiff's Exhibit 57].

The Defendants assert that the Plaintiff has not sufficiently pled a prima facie case for any of the counts in the Complaint, despite the fact that the Plaintiff has had more than three years to do so. The Plaintiff retained counsel on or around October 25, 2010, only two months after starting at West Side Middle School. [Dkt. 33-4, Plaintiff's Exhibit 58].  Even though not immediately filed with this Court, the first draft of the complaint is dated November 23, 2010, more than three years ago.  [Dkt. 33-3, Plaintiff's Exhibit 43].

15

III.   **Legal Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient."  *Welch–Rubin v. Sandals Corp.,* No. 3:03cv481(MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. Connecticut*, No.

**16**

3:09cv1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is

no evidence upon which a jury could properly proceed to find a verdict for the

party producing it and upon whom the onus of proof is imposed, such as where

the evidence offered consists of conclusory assertions without further support in

the record, summary judgment may lie.  *Fincher v. Depository Trust and

Clearance Co.*, 604 F.3d 712, 720 (2d Cir. 2010).

### A.  Discrimination Claims

The Plaintiff alleges several claims for racial discrimination against the

individually named Defendants under both 42 U.S.C. §§ 1981, 1983 and against

the Waterbury Board of Education under Title VII.  These discrimination claims

are analyzed under the burden-shifting framework detailed in *McDonnell Douglas

Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Sorlucco v. New York City Police

Dep't*, 888 F.2d 4, 7 (2d Cir. 1989) (1983 claims); *Holcomb v. Iona College*, 521 F.3d

130, 138 (2d Cir. 2008) (1981 claims).  Within that framework, the Plaintiff must

initially meet the burden of proving a prima facie by showing that: (1) the Plaintiff

belonged to a protected class; (2) he was qualified for the position; (3) he

suffered an adverse employment action; and (4) the adverse employment action

occurred under circumstances giving rise to an inference of discrimination.

*McDonnell Douglas Corp.*, 411 U.S. at 802-04.  "The requirements to establish a

prima facie case are minimal . . ., and a plaintiff's burden is therefore 'not

onerous.'"  *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 128 (2d

Cir. 2012) (citations and internal quotation marks omitted).

17

The Defendants argue that the Plaintiff has not established a prima facie case because there is no evidence that would raise an inference of discrimination. [Dkt. 21, Memorandum of Law in Support of Defendants' Motion for Summary Judgment, p. 4].  The Plaintiff claims that he has alleged sufficient facts that show he was treated differently than similarly situated SLPs.  [Dkt. 34, Plaintiff's Opposition to Motion for Summary Judgment, p. 7].  The Defendants do not contest that the Plaintiff has met the first three elements of a prima facie case for discrimination.  Furthermore, the Plaintiff's only assertion for the fourth element, an inference of discrimination, is based on the doctrine of disparate treatment. Indeed, the Plaintiff has not adduced any evidence that any racial comments were made to him by any of the Defendants as related to the present claims or that any of the Defendants expressed, either directly or indirectly, any racial animus.  [Dkt. 43-1, Defendants' Exhibit 1, 56:19-57:5].  His only allegations are that he was treated differently than his Caucasian counterparts.  [*Id.* at 56:10-11; Dkt. 34, p. 6-10].

"One way that a plaintiff can create an inference of discrimination is by introducing evidence that similarly situated individuals of a different race were treated differently."  *Smith v. Cingular Wireless*, 579 F. Supp. 2d 231, 243 (D. Conn. 2008).  Other circumstantial evidence, such as negative comments about the protected class or the sequence of certain events, can also be used to prove the requisite inference.  *Chambers v. TRM Copy Ctr. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  "When plaintiffs seek to draw inferences of discrimination by showing that they were 'similarly situated in all material respects' to the individuals to whom

18

they compare themselves . . . their circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101-02 (2d Cir. 2001) (citations and internal quotation marks omitted).  "What constitutes 'all material respects' therefore varies somewhat from case to case and . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness."  *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (citations and internal quotation marks omitted).  "In other words, there should be an objectively identifiable basis for comparability."  *Id.* (citations and internal quotation marks omitted).

The Plaintiff makes a series of claims that he argues prove he was treated differently than similarly situated Caucasian SLPs, including that he was terminated unlike any other SLP, that he was involuntarily assigned to a school other than where he had been assigned for more than ten years, that he was the only SLP who was denied access to critical student class schedules, master schedules, and rotating schedules, that he was the only SLP who experienced on-going problems with TIENET, that he was the only SLP who was verbally remonstrated for attempting to find out why these problems were still occurring, and that he was the only SLP who was regularly and consistently called into pre-disciplinary and disciplinary meetings.  [Dkt. 34, p. 8-9].

Noticeably absent from either parties' briefs is the critical explanation regarding whether the Plaintiff was similarly situated to the other SLPs at West

**19**

Side Middle School during the 2010-2011 school year and to the SLPs at Crosby High School during 2011-2012 school year. The Plaintiff resigned from his position as a tenured SLP in 2007 to pursue litigation against the school district and several individual defendants, some of whom are named again in this litigation. After a jury verdict was returned in his favor, he executed the Settlement Agreement with the school district to forgo damages provided he was rehired to the first available opening for an SLP. Accordingly, he was assigned to a middle school position in a COMMpact school, as opposed to a high school where he had worked before. To appropriately determine if he was similarly situated to other SLPs at the middle school in "all material respects," it would have been important to know if any of the other SLPs at the West Side Middle School were also in their first year at the school, and it would have been helpful to have an explanation of the experience these other SLPs had as related to their professional development. For example, several of the allegations here relate to the Plaintiff's issues with technology and finding student schedules. If other SLPs did not have similar issues it may have been because they spent several years at West Side Middle School and understood how the school operated. On the other hand, when they first started at the school, they may have had similar issues as the Plaintiff. Without this information, it would be impossible for the Court to find that the Plaintiff was similarly situated to these other SLPs, and, therefore, the Plaintiff has failed to prove an inference of discrimination based on adverse treatment. Even so, since neither party briefed this point, we will assume for this analysis that the Plaintiff has demonstrated that he was similarly situated

20

to the other SLPs.  The only remaining question is whether Defendants treated him differently than those other pathologists, and the evidence shows that they did not.

First, as related to the Plaintiff's issues with TIENET, the evidence shows that the Plaintiff was provided the same security access to the system as all other SLPs, and that the Plaintiff was able to log onto and use the program beginning on August 31, 2010.  [Dkt. 43-2, ¶¶ 8-14; Dkt. 31, ¶ 30].  Moreover, the Plaintiff attended TIENET training sessions, and after still complaining about experiencing technical issues, was given direct assistance and training by Derenches.  Even if the Plaintiff was having issues with his home computer, or any other issues while logging on, he has not offered a shred of evidence linking his issues with the Defendants' actions or omissions.  Instead, the Plaintiff relies on the conclusory allegation that since he was experiencing technical issues with TIENET, it must have been caused by the Defendants' discriminatory animus.  This allegation could only be plausible with evidentiary support, but the Plaintiff provides none.

If the basis for the Plaintiff's claim is that he was unable to use his home computer to log into the system remotely, then it is obviously not the Defendants' responsibility to cure this defect.  It is true that when the Plaintiff attempted to contact TIENET's software manager, he was chastised by the school district, but not because he was attempting to resolve his issues, but rather because his wife, who is not an employee of the school district, possibly had access to confidential school records.  Furthermore, the letter never states that the Plaintiff was not permitted to contact the software manager, it only states that his wife "cannot

21

assist [her] husband to the extent it requires [her] to view confidential student records." [Dkt. 33-4, Plaintiff's Exhibit 62]. Ultimately, the Plaintiff has alleged that he had trouble accessing the TIENET program, but has provided no proof that his technical difficulties were the result of anything the Defendants did or failed to do and has provided no proof that the Defendants took any action to frustrate the resolution of these issues. On the other hand, the evidence shows that the Plaintiff was able to use the system, and, when he notified his superiors that he was having technical issues, they assisted him in resolving them. Finally, the Plaintiff has only made the conclusory allegation that no other Caucasian SLP had similar issues with TIENET. However, he provides no evidentiary support for these claims or even explained his basis for making the statement. For example, he did not allege that he questioned all of the other SLPs about their experiences with TIENET. He does not compare himself to any other particular person and thus fails to allege sufficient facts necessary to show disparate treatment.

Second, the Plaintiff alleges that other Caucasian SLPs had access to the AS400 system, but he was only given access after independently asking a secretary for the credentials. This unsupported and conclusory allegation is also contradicted by the evidence. The Defendants averred that only house secretaries, principals, and vice principals had access to the program, not SLPs or their immediate supervisors. Even though the administration ultimately provided the Plaintiff with access to the system in an apparent hope that it would alleviate some of his performance problems, the Plaintiff has not shown that other similarly situated SLPs had access to the system. *See Schwapp v. Town of*

*Avon*, 118 F.3d 106, 110 (2d Cir. 1997) ("[E]ven in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.").

Third, the Plaintiff alleges that he was not told how to obtain student schedules necessary to complete the IEPs and was not informed that the school operated on a rotating schedule.  However, the Defendants, along with other teachers and administrators, averred that they told the Plaintiff how to obtain the schedules and were confused as to why the Plaintiff had such difficulty in collecting the information.  Furthermore, the Plaintiff even admitted that Derenches and Abell told him how to collect student schedules.  [Dkt. 43-1, Defendants' Exhibit 1, 39:17-18].  Even so, the Plaintiff alleged that although he was told to collect the schedules from the house offices, only one house secretary actually provided the schedule to him.  [*Id.* at 32:24-25].  Interestingly, none of the secretaries or other house officials who were actually responsible for providing schedules are named as Defendants.  Therefore, the Plaintiff has failed to introduce sufficient evidence to demonstrate that the Defendants named in this suit are responsible for this issue.  The facts also support the finding that the Plaintiff was given sufficient instruction as to how to obtain the requisite schedules, and the schedules and other information were posted in the house rooms in the school.  Furthermore, the Plaintiff's only assertion to show disparate treatment was that other SLPs were given the schedules and had access to the AS400 system which facilitated the transfer of this information.  As to the former, this again is a conclusory allegation without substantiating facts, and as to the

23

latter, it is contradicted by the evidence because no SLPs had access to the AS400 except for the Plaintiff.  The Court also wishes to note that even though the Plaintiff was given several weeks to prepare a schedule, the Defendants ultimately requested that a former SLP, Anne Marie Cullinan, create a master schedule for him.  [Dkt. 22, ¶ 43; Dkt. 33-2, Plaintiff's Exhibit 41].  This cuts against the Plaintiff's contention that the Defendants were working to ensure his quick termination because at this point they had sufficient cause to reprimand him, but instead offered to help him.  Moreover, even though the Plaintiff argues that the schedule was replete with errors, there is no proof that these errors were intentionally made, let alone existed.  The facts are simple, due to the Plaintiff's inadequate job performance, the Defendants were required to elicit the aid of other school administrators to ensure the school's compliance with the statutory IEP requirements.

Fourth, the Plaintiff alleges that he was not given the teacher directory or information regarding the rotating schedule at West Side Middle School.  Again, even though the Plaintiff alleges not to have received such information, the evidence shows that he was given a packet of information at the beginning of the year that included a list of teacher names, subjects and classrooms, as well as information about the rotating schedule.  Even if he was not provided this information, he was aware of the house rotation by at least December 2010, yet apparently failed to obtain a schedule at that time because he asked Nappi, again, for a rotation schedule in February 2011.  The facts and bare conclusory allegations are insufficient to show disparate treatment.

24

Fifth, the Plaintiff alleges that he was assigned to a "storage closet" with "exposed wiring" for his office space while other Caucasian SLPs had regular office spaces.  The Plaintiff admitted that he did not know whether the office had been occupied before he started at the middle school, but asserted that he knew that a black attendance counselor was assigned the office after he was moved.  The Defendants averred that prior to the 2010-2011 school year, the office was occupied by a Caucasian SLP.  The Defendants also explained that the purpose for this was that the office's location was adjacent to the offices of other speech and language personnel, thus providing Oliver access to his peers and ready access to others from whom he could ask questions, receive help and maximize his ability to perform his job.  Accordingly, the Plaintiff has not demonstrated that he was treated differently than similarly situated SLPs due to his race or color.  Instead it shows that he was not only treated the same, but supported in the position.  Moreover, shortly after complaining about the office assignment, he was reassigned, so no lasting employment effect existed.  These factual allegations do not support a claim for disparate treatment.

Sixth, the Plaintiff alleges that he was the only SLP who was involuntarily assigned to a school in contravention of the relevant collective bargaining agreement considering his tenure.  Oliver's reemployment was not incident to the Collective Bargaining Agreement; he was reemployed incident to the Settlement Agreement.  Further, the Plaintiff was assigned to West Side Middle School and signed a long-term teacher's contract on August 24, 2010.  Even assuming arguendo that the Collective Bargaining Agreement applied, reliance on the

**25**

transfer provisions is misplaced because the Plaintiff was not transferred; he was rehired.

In addition, Oliver's contention that his assignment was in contravention of Settlement Agreement is based on the Plaintiff's misinterpretation of that agreement.  The Settlement Agreement stated that the superintendent was required to "hire and enter into a contract with Eugene Oliver as a speech language pathologist and place him in the next available opening in the school system for that position and field."  It also stated that "[a]lthough the parties agree that Mr. Oliver will receive no back pay, he will be employed by the Waterbury Board of Education in a status and with seniority as if he never resigned including but not limited to tenure, all unused accumulated sick time, vacation time, personal time."  The Plaintiff contends that these two provisions read together required that the Plaintiff be given his choice of schools as that is what would have happened had he maintained his seniority.  However, that is an implausible reading of the Settlement Agreement.  The language of contracts "must be accorded its common, natural, and ordinary meaning and usage . . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms."  *Goldberg v. Hartford Fire Ins. Co.*, 849 A.2d 368, 373 (Conn. 2004) (citations and internal quotation marks omitted). Furthermore, "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity."  *Id.* (citations and internal quotation marks omitted).  Finally, "[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision

**26**

must be given effect if it is possible to do so." *United Illuminating Co. v. Wisvest-Conn., LLC*, 791 A.2d 546, 550 (Conn. 2002).

Here there are two provisions in issue; the first requires the school district to place the Plaintiff in the first open position for a SLP in the district, and the second requires that the Plaintiff be employed in the same status as he had previously.  Obviously, the second provision does not apply to his initial rehiring, but only affects his status once employed.  The proper reading is that the Plaintiff was to be placed in the first open position, and, then once in that position, he was to be treated with the same tenure he had obtained in 2007.  Any other reading would render one of the provisions superfluous.  With this reading, the question then becomes whether the Defendants breached the Settlement Agreement, and, if so, did that amount to disparate treatment.

The Plaintiff has not put forth any evidence showing that he was not assigned to the first available SLP position in the district.  Instead, he argues that his seniority should have permitted him to replace the per diem SLPs who were then working at Crosby High School.  Unfortunately, if a position is occupied by a per diem teacher, then the position by definition is not "available."  It may be the case that a per diem SLP has no contract and is hired at the start of each day, but the Plaintiff failed to establish those facts.  Instead, the Plaintiff only alleges that the per diem SLPs had no long-term contracts.  That allegation alone does not establish that there was an SLP position available at Crosby High School because it does not establish the employment rights and tenure of the per diem SLPs employed at Crosby High School.  Accordingly, the Plaintiff has not proved that

27

the Defendants breached the Settlement Agreement, and, therefore, has not proved that he was placed at West Side Middle School due to some racial animus as opposed to a faithful execution of the Settlement Agreement.

Furthermore, in 2011, when a position at Crosby High School became available, the Plaintiff applied for the assignment and was granted the transfer. Clearly, if the Defendants' goal was to prevent the Plaintiff from returning to Crosby High School, they would have prevented his later transfer.

Finally, the Plaintiff argues that the Defendants treated him differently than other similarly situated SLPs because he was constantly called into pre-disciplinary and disciplinary hearings and was ultimately terminated.  However, the Defendants put forth evidence showing that a Caucasian SLP was suspended for five days for failure to perform her employment duties in March 2010.  The Plaintiff argues that this is insufficient to rebut his claim because the Defendants have failed to show how he was similarly situated to the former SLP.  Yet, it was the Plaintiff that claimed and thus the Plaintiff who has the burden of presenting facts to raise a genuine issue of material fact as to whether he was similarly situated to the other Caucasian SLPs at West Side Middle School.  The Plaintiff has failed to present such facts and the Defendants have refuted his unsupported claim by showing that other SLPs faced the same adverse disciplinary consequences when they failed to perform.  The Plaintiff has not met his burden of proving an inference of discrimination because he has not offered any comparative evidence tending to show that he was treated differently than similarly situated, Caucasian SLPs.

28

The Plaintiff has also not alleged any other circumstantial evidence that demonstrates an inference of discrimination.  For example, the Defendant admitted that no negative comments regarding his race were made.  In his deposition, the Plaintiff essentially admitted that he had no factual basis for his belief that he was discriminated against and that his conviction that he was discriminated against was based purely on his subjective belief rather than any objective acts.  For example, when asked why he thought Derenches discriminated against him, he said "maybe she's a bully and it has nothing to do with race, but it appeared racial to me."  [Dkt. 43-1, Defendants' Exhibit 1, 105:11-12].  Similarly, when responding to the same question regarding Nappi, he stated that "when it happens enough, you start making conclusions, reach conclusions. Maybe it wasn't anything to do with my race, but I do think it was."  [*Id.* at 106:22-107:4].  It is well settled that a plaintiff's subjective belief that he was the victim of racial discrimination is not sufficient to prove an inference of discrimination.  *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 561 (2d Cir. 1997) (plaintiff's "purely speculative" suggestion that manager preferred younger workers was insufficient to support an inference of age discrimination), *cert. denied*, 525 U.S. 936, 119 S. Ct. 349, 142 L.Ed.2d 288 (1998); *see also Kazukiewicz v. Kaleida Health*, No. 08-CV-341-JTC, 2010 WL 2998671, at *5 (W.D.N.Y. July 26, 2010) ("the courts have uniformly rejected the notion that a plaintiff's subjective belief about facially neutral evidence, in the absence of any other indication of discriminatory animus, is sufficient to create a genuine issue of fact regarding an employer's motives."). In short, the Plaintiffs prima facie case is premised on his own subjective beliefs,

29

lacking evidence that he actually was treated different than any other similarly situated SLP.  Accordingly, the Plaintiff has failed to prove a prima facie case of discrimination based on race or color because he has failed to show an inference of discriminatory animus.  *See Holcomb*, 521 F.3d at 137 ("Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."); *Edwards v. Metro-N. Commuter R. Co.*, 463 F. Supp. 2d 279, 284 (D. Conn. 2006) ("Thus, even if plaintiff's affidavit were sufficient to establish comparable seriousness of violations committed between himself and the alleged comparators, the absence of any evidence concerning the disciplinary records of the claimed comparators, particularly in light of the severity of plaintiff's own disciplinary history, is fatal to his disparate treatment claim.").

Even if the Plaintiff has proved a prima facie case, under the *MacDonald Douglas* burden-shifting framework, the Defendants have offered a non-discriminatory reason for their actions: the Plaintiff's poor job performance.  The burden, therefore, would return to the Plaintiff to show, by a preponderance of the evidence, that the Defendants' proffered reasons for the adverse employment actions are pretextual.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993).  The Defendants' explanations cannot be "proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason."  *Sabatino v. Flik Int'l Corp.*, 286 F. Supp. 2d 327, 334-335 (S.D.N.Y. 2003) (internal quotation marks and citations omitted).  The Plaintiff may meet her burden "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Cooper v. Conn. Pub. Defender's Office*, 480 F. Supp. 2d 536, 545 (D. Conn. 2007), *aff'd sub nom.*, 280 F. App'x 24 (2d Cir. 2008).  Here, the Defendants have alleged that all adverse employment actions for which they were responsible were caused by the Plaintiff's failure to adequately perform his employment responsibilities.  Furthermore, the Defendants have argued that they have not treated the Plaintiff differently than Caucasian SLPs.  The Plaintiff has not offered any evidence or proof to show that poor performance was pretext; on the contrary, he admits that he was not adequately performing his job.  Furthermore, no evidence at all has been submitted to show that even if the Defendants' reasons were pretext, race was a substantial reason, let alone any reason, for the adverse employment actions.  *See Smith v. Cingular Wireless*, 579 F. Supp. 2d 231, 243 (D. Conn. 2008) ("Indeed, even when a plaintiff has established her prima facie case *and* shown that the defendant's explanation for its actions is lacking, the plaintiff will still not survive summary judgment unless she can show that the defendant's false explanation was proffered to make *race discrimination*." (emphasis in the original)).  Without showing how and why the Defendants actually acted with racial animus, the Plaintiff's discrimination claims cannot survive a summary judgment motion.  Accordingly, for all of these reasons, the Plaintiff's claims of discrimination based on race or color are DISMISSED.

31

### B.  Retaliation Claims

The Plaintiff's second claim is that the Defendants' actions "were carried out in retaliation for his having previously opposed their unlawful and discriminatory actions, including but not limited to, his having reported their violations of Title VII of the Civil Rights Acts of 1964 and C.G.S. § 31-51m."  [Dkt. 1, ¶ 48].

Just as claims for discrimination, retaliation claims under Title VII, section 1981, and section 1983 are "evaluated using a three-step burden-shifting analysis."  *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010); *see also Gierlinger v. Gleason*, 160 F.3d 858, 868-69 (2d Cir. 1998).  In order to prove a prima facie case for retaliation, a plaintiff must

> adduce evidence sufficient to permit a rational trier of fact to find [1] that [ ] he engaged in protected participation or opposition under Title VII . . ., [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (citations and internal quotation marks omitted).  The Defendants argue that the Plaintiff has failed to demonstrate a prima facie showing of retaliation because he has not alleged any adverse employment action and he has failed to demonstrate a causal connection between any alleged adverse action and engaging in the protected activity.  The Defendants do not contest that the Plaintiff engaged in protected activity by filing his prior lawsuit and that the employer knew about this action.

#### i.  Adverse Employment Action

The Defendants argue that none of the Plaintiff's alleged adverse employment actions meet the necessary threshold for the retaliation claim.  "'There are no bright-line rules' with respect to what constitutes an adverse employment action for purposes of a retaliation claim, and therefore 'courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse.'"  *Fincher*, 604 F.3d at 721 (quoting *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997)).  However, "[a]ffirmative efforts to punish a complaining employee are at the heart of any retaliation claim."  *Id.* (citations and internal quotation marks omitted).  As related to the retaliation claim, the Defendants contest that the Plaintiff has met his prima facie burden based on adverse employment action, but when discussing the same issue in the discrimination claim, they admitted that the "plaintiff alleges he was suspended without pay, received reprimands at pre-disciplinary and disciplinary meetings and that he was terminated, all of which could constitute adverse employment actions for purposes of his prima facie case."  [Dkt. 21, p. 4].  Indeed, in this Circuit, suspension without pay for a week constitutes a sufficient adverse employment action to maintain a retaliation claim.  *See Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223-24 (2d Cir. 2001); *see also Satterfield v. United Parcel Serv., Inc.*, No. 00–CV–7190, 2003 WL 22251314, at *13 (S.D.N.Y. Sept. 30, 2003) ("[T]he one-day suspension ... arguably meets the 'materially adverse' standard outlined by the Second Circuit....").  Here, the Plaintiff has alleged he was suspended without pay for five days.  [Dkt. 32, Oliver Affidavit, ¶¶ 30, 40].

33

Even though several of the Plaintiff's other allegations, as discussed in the section related to adverse inference of discrimination, are not supported by the evidence, the Defendants do not contest, and in fact admit, that the Plaintiff alleged an increase in disciplinary meetings that ultimately resulted in suspension and termination.  These allegations are sufficient for a prima facie finding of adverse employment action.  Even though the Court need not address the Plaintiff's contention that there is sufficient evidence showing a pattern of harassment, since the Court found adverse employment actions directly, it is worth noting that "alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable."  *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

## ii.  Causal Connection

The Defendants next argue that the Plaintiff has not demonstrated a sufficient causal connection between the alleged adverse employment actions and the protected conduct to plead a prima facie case for retaliation.  It is clear that in this Circuit a causal connection can be proved by circumstantial as well as direct evidence.  *O'Brien v. Nat. Gypsum Co.*, 944 F.2d 69, 72 (2d Cir. 1991) ("it is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts.").  Furthermore, "a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment]

34

action." *Isaac v. City of New York*, 701 F. Supp. 2d 477, 493 (2d Cir. 2010) (quoting *Gorman-Bakos v. Cornell Co-op. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001)). "The Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Id.* (citations and internal quotation marks omitted). "While there is no bright line rule, it is important that courts consider the context of particular cases in exercising judgment and drawing permissible inferences from temporal proximity." *Id.* However, where a Plaintiff only alleges temporal proximity in addressing the causal connection, the time must be substantially close, and a gap of two months is insufficient to demonstrate a causal connection. *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 480 (2d Cir. 2009).

Here, the Defendants allege there is no temporal proximity because "[t]he actionable adverse employment actions alleged by Mr. Oliver . . ., occurred more than three (3) years after the conduct alleged in his prior lawsuit and more than six (6) months after that prior litigation ended." [Dkt. 21, p. 23]. While it is true that the adverse employment action and the termination of the past litigation was not extremely close temporally, the Plaintiff alleged that "immediately" upon returning to work for the school district, he noticed an increase in pre-disciplinary and disciplinary meetings. [Dkt. 32, ¶ 30]. The evidence shows that the first pre-disciplinary meeting was on October 18, 2010, but the Plaintiff avers that several informal meetings were held between the Plaintiff and Drenches in early October

35

related to his tardiness at scheduling his students for services.  [Dkt. 33-2, Plaintiff's Exhibit 41].  It is arguably very close given the precedent in this Circuit whether the Plaintiff has sufficiently alleged an appropriate temporal proximity.  However, drawing all inferences in favor of the Plaintiff, this temporal proximity is sufficient to show a causal connection of engaging in the protected activity of reporting racial discrimination and the adverse employment conduct which began by the consistent and repeated verbal reprimands and negative evaluations in October 2010, culminating in an unpaid suspension and termination.  The Defendants' claim that there was no causal relation since the adverse employment action began three years after the protected conduct is unavailing.  The Plaintiff was not hired at the school until late August 2010; so, any adverse employment action before that time was impossible as the Plaintiff was not employed.  Moreover, here, the Plaintiff stated that "immediately upon [his] return," he experienced the negative hostility that marks any type of retaliatory conduct.  The roughly two month period between when he was rehired and when the first official pre-disciplinary meeting occurred, when coupled with the other alleged informal confrontations between the Plaintiff and Derenches, sufficiently demonstrates temporal proximity to satisfy the causal connection prong.  Accordingly, the Plaintiff has sufficiently alleged a prima facie case for retaliation.

### iii.  Legitimate Non-Retaliatory Purpose

"Where the plaintiff demonstrates a prima facie case of retaliation, defendants must offer legitimate, non-retaliatory reasons for the employment actions at issue.  This burden is one of production, not persuasion."  *Isaac*, 701 F. Supp. 2d

at 495.  Before examining the proffered reasons, we must first review those

claims made by the Plaintiff as constituting adverse employment actions.  The

Plaintiff alleges that the following constituted adverse employment actions:

> (a) The attempted probationary contract; (b) The
> involuntary assignment to an unfamiliar middle school;
> (c) The refusals to provide basic information on student
> schedules, master schedules, and rotating schedules;
> (d) The assignment to an unsafe storage closet as office
> space; (e) The almost immediate escalation of pre-
> disciplinary and disciplinary meetings; (f) The harassing
> and haranguing verbal assaults; (g) The TIENET on-
> going computer problems; (h)The refusal to allow direct
> communication with TIENET; [and] (i) The refusal to
> agree to remedy and backlog except by disciplinary
> measures.

[Dkt. 34, p. 22].  We must now determine which of these constitute possible

adverse employment actions.  First, the attempted probationary contract cannot

be viewed as an adverse employment action because it was never signed nor

executed by any party.  Instead, the Plaintiff refused to sign the contract in what

appears to have been given to him by mistake by the principal's secretary.

Therefore, since it was immediately remedied, there was no adverse change in

employment conditions and, accordingly, no adverse action.  Second, the

involuntary assignment to an unfamiliar school was nothing more than the

performance of the Settlement Agreement to which the Plaintiff agreed.  This

Court does not agree with the Plaintiff that his assignment was an involuntary

transfer, rather it was what the Settlement Agreement required: the assignment to

the first available position in the district.  Therefore, this claim does not

constitute an adverse employment action.  Third, the claim for the refusals to

provide basic information on student schedules, master schedules, and rotating

37

schedules is not supported by the evidence.  As discussed above, the Plaintiff admitted that he was told how and where to collect student schedules.  Moreover, none of the individuals who were actually responsible for giving the Plaintiff such information are even named as defendants in this action.  Therefore, the Plaintiff's blanket and conclusory assertion that there was a conspiracy to prevent him from obtaining the requisite information is unfounded.  Fourth, the assignment to an unsafe office space was also not a material adverse employment action because as soon as the Plaintiff expressed a desire to transfer offices, he was given a new space.  Since there was no material effect on the Plaintiff's employment, it is not an adverse employment action.  Fifth, the TIENET program-related issues are also not supported by the facts.  There is no evidence that the Defendants sabotaged the Plaintiff's TIENET account; instead, when he needed assistance, the Defendants were willing to assist.  Even though the Plaintiff's wife was chastised for reaching out to the TIENET manufacturer directly, the explanation given was concern for dissemination of confidential information.  Therefore, the TIENET problems he was experiencing can best be reduced to personal issues with the computer program.  However, the remaining issues, namely the pre-disciplinary and disciplinary meetings, what the Plaintiff viewed as verbal attacks, and the resulting termination, are possible adverse employment actions for which the Defendants need to offer a non-retaliatory explanation.

The Defendants have alleged that the Plaintiff was terminated and subject to the other adverse employment actions in this case because he was not

38

adequately performing his job.  In support, they offered substantial evidence showing that several of the Plaintiff's students were not in compliance with their IEP requirements, they offered evidence showing that the Plaintiff was repeatedly monitored and asked to provide information logs showing how he was spending his time, and they provided emails from independent teachers and administrators who seemed to consistently reach out to the Plaintiff expressing concern that their students were not receiving the necessary SLP services.  Poor job performance is a legitimate, non-retaliatory explanation for the adverse employment actions taken.  *See Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012) (poor performance is sufficient nondiscriminatory reason for termination); *Duffy v. State Farm Mut. Auto. Ins. Co.*, 927 F. Supp. 587, 594 (E.D.N.Y. 1996) (finding that defendants sufficiently alleged poor job performance as a reason for adverse employment action by submitting affidavits of employees describing in detail the plaintiff's performance, and various memoranda corroborating those claims); *Whitlow v. Visiting Nurse Ass'n of W. N.Y.*, 420 F. Supp. 2d 92, 113 (W.D.N.Y. 2005) (poor performance is a legitimate nondiscriminatory reason which shifts the burden back to the plaintiff), *aff'd*, 186 F. App'x 36 (2d Cir. 2006).

### iv.  Shift of Burden Back to the Plaintiff

Once a defendant offers a legitimate non-retaliatory reason for adverse employment actions, the "presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Hicks*, 293 F.3d at 165 (citations and internal quotation marks omitted).

**39**

"A plaintiff can sustain this burden by proving that a retaliatory motive played a part in the adverse employment actions even if it was not the sole cause . . . ."  *Id.* (citations and internal quotation marks omitted).  However, to satisfy this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder [sic] to conclude that the employer's explanation is merely a pretext for impermissible retaliation."  *Cifra v. G.E. Co.*, 252 F.3d 205, 216 (2d Cir. 2001); *see also El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2011) (per curiam) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy the appellant's burden to bring forward some evidence of pretext.").

The Plaintiff does not argue that the reason for the termination was pretext.  In *Sharpe v. Utica Mut. Ins. Co.*, the court granted the defendant's motion for summary judgment when the plaintiff failed to present any credible evidence to "refute the substantial findings supporting Utica Mutual's determination that [the plaintiff] was inadequately performing her job, especially in light of the number of co-workers who provided descriptions of her performance issues and the review period afforded by her supervisors prior to her termination."  *Sharpe v. Utica Mut. Ins. Co.*, 756 F. Supp. 2d 230, 252 (N.D.N.Y. 2010).  Similarly here, the Defendants have supplied evidence showing that at least three teachers both at West Side Middle School and Crosby High School had issues ensuring that the Plaintiff was performing his job.  The Plaintiff, furthermore, admits that some of his students were not incompliance with their IEPs and that he was ultimately unable to create

a master schedule for his students in the fall of 2010.  Therefore, there is no

credible evidence showing the reason for his termination was pretext.  Indeed,

even though not argued by the Defendants, it appears that the school took a very

fair approach in hoping to rectify the Plaintiff's performance problems.  The

Plaintiff does not contest that his absences in the 2010 and 2011 school years

resulted in missing over 42% of the work days.  The Defendants never mandated

that he take FMLA leave, as they were legally permitted to do, nor did they subject

him to unnecessary disciplinary tactics.  The Plaintiff stated that several of the

Defendants were rude and hostile to him, but he could only recount one incident

in which Derenches requested that he stop testing students and attend a meeting

with her only to find out later that the meeting was not then occurring.  In *Yu v.*

*N.Y. State Unified Court Sys. Office of Court Admin.*, the court found insufficient

on summary judgment the plaintiff's inability to articulate specific negative

comments and relying on "personal opinion and 'feeling'" that discrimination or

retaliation was occurring.  *Yu v. N.Y. State Unified Court Sys. Office of Court*

*Admin.*, No. 11civ3226(JMF), 2013 WL 3490780, at *5 (S.D.N.Y. July 12, 2013).  Just

as there, the Plaintiff's unsupported allegations are not sufficient to maintain a

cause of action for retaliation.

Furthermore, the Plaintiff's contention that the Defendants immediately began

developing a paper trail against him so as to ensure his swift termination is not

supported by the evidence.  The Plaintiff alleges that Derenches was always

present with a witness when she reprimanded him, but the Plaintiff hired an

attorney in October of 2010 and drafted a complaint in this matter by November of

41

that year.  Clearly, both sides were preparing for the seemingly unpreventable resolution of the present litigation.  Therefore, the fact that Derenches came with a witness does not show a retaliatory animus, but rather a concern for exactly what occurred: naming her as a defendant in a civil action.  Furthermore, general rude behavior or comments without more are insufficient to demonstrate retaliation.  *See McWhite v. New York City Housing Auth.*, No. 05CV0991(NG)(LB), 2008 WL 1699446, at *14 (E.D.N.Y. April 10, 2008).

The Plaintiff relies on *Krieger v. Gold Bond Building Prods.*, as support for his claim that the development of a "paper trail" is sufficient proof to succeed in bringing a claim for discrimination or retaliation.  *Krieger v. Gold Bond Bldg. Prods.*, 863 F.2d 1091, 1098 (2d Cir. 1988).  In that case, however, the court specifically found that the "'overwhelming *weight* of the evidence' showed that the [Plaintiff's] sales performance was good throughout her tenure as a salesperson."  *Id.* (emphasis in the original).  The Court agrees with the Plaintiff that if there is sufficient proof that the Defendants were creating a paper trail so as to quickly terminate the Plaintiff's employment, a discrimination or retaliation claim may be proved.  However, unlike in that case, the Plaintiff here admits that he was not adequately performing his job.

Upon review the record, the Plaintiff has not put forth any evidence aside from his own conclusory allegations that the Defendants' decision to discipline, suspend, and terminate him was based at all on a desire to retaliate against him for engaging in legally protected activity.  Instead, the Plaintiff openly admits that he was not performing his job as he was required to do.  Accordingly, the

**42**

Plaintiff's retaliation claim must fail as no there are no material issues of fact that could lead to a determination that retaliatory animus played any role in the Defendants' actions.

### C.  Intentional Infliction of Emotional Distress

The Plaintiff alleges a claim of intentional infliction of emotional distress against all of the individually named Defendants.  [Dkt. 1, Count 3].  In order to prevail on a claim for intentional infliction of emotional distress, a plaintiff has the burden of establishing four elements: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. *Petyan v. Ellis*, 200 Conn. 243, 253, 510 A.2d 1337 (1986).  "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." *Ancona v. Manafort Bros., Inc.*, 56 Conn. App. 701, 712, 746 A.2d 184 (Conn. App. 2000).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443, 815 A.2d 119 (2003).

Courts in Connecticut have held that discipline and instances of harassment, even verbal abuse, do not constitute the requisite outrageous and extreme

43

conduct required to maintain a charge of intentional infliction of emotional distress.  In *Carone v. Mascolo*, the court held that when the teacher plaintiff alleged that she was suspended in retaliation for her exercise of freedom of speech and that the defendants began soliciting and encouraging both oral and written complaints against the plaintiff from her students, she failed to state a claim for intentional infliction of emotional distress.  *Carone v. Mascolo*, No. 3:06cv01094(DJS), 2007 WL 2318818, at *5 (D. Conn. Aug. 14, 2007).  Another decision held that a plaintiff did not sufficiently state a claim when he alleged that he was "yelled at, disciplined and demoted, that his desk was searched and his police cruiser was taken away" all under the guise of racial animosity.  *Melendez v. City of New Haven*, No. 3:13cv860(RNC), 2013 WL 6859941, at *4 (D. Conn. Dec. 30, 2013).  To rise to the requisite level, the conduct must be so extreme and targeted that the actor must have or should have known causing distress was likely.  For example, a court found sufficient grounds to maintain the claim when a plaintiff alleged "[s]he was subject to a course of verbal abuse and profanity, including being referred to by racially and ethnically derogatory names and asked what banana boat she came off, a remark insulting her national origin and ethnicity.  She was asked what corner she hung out at, which could reasonably be interpreted as suggesting she was a prostitute.  Her surname was used in a derogatory manner to refer to a bathroom or toilet.  She was ridiculed about her appearance in a sexually demeaning manner.  She was physically struck in the head and face with a hand, box or other items.  [And] [s]he was subjected to

44

degrading conditions in order to use the restroom."  *Pottie v. Atl. Packaging Grp. LLC*, No. 3:12cv773(WIG), 2012 WL 6087282, at *1 (D. Conn. Dec. 6, 2012).

Here, the Plaintiff has not alleged any extreme or outrageous behavior.  He was disciplined at work for his failure to adequately perform his job responsibilities.  Even though he alleges that Derenches and other Defendants were hostile and verbally reprimanded him, he does not allege one specific instance where derogatory comments, expletives, or other profanity was used. The Plaintiff relies on *Johnson v. City of Bridgeport Bd. of Educ.* as support for his contention that he has alleged sufficient facts to sustain a count for intentional infliction of emotional distress.  In that case, the court denied summary judgment when the plaintiff alleged that he was forced to resign his position as principal after he refused to falsify student records in order to deceive federal investigators who intended on examining the documents.  *Johnson v. City of Bridgeport Bd. of Educ.*, No. CV95321129, 1999 WL 391344, at * (Conn. Sup. Ct. June 3, 1999).  Unlike in our case, the plaintiff there was pressured by the defendants into resigning after failing to assist their fraudulent scheme.  Here, there is no evidence alleged to show that the Defendants did anything of the sort. Instead, they attempted to help the Plaintiff correct his performance issues, giving him approximately eighteen months to improve before terminating his contract.  Without alleging specific instances of outrageous behavior, the Plaintiff's claim must fail.

**45**

D.  Negligent Infliction of Emotional Distress

Finally, the Plaintiff alleges a claim for negligent infliction of emotional distress against the Board of Education.  The Defendants argue that the Plaintiff has not alleged any unreasonable conduct as related to his termination, and, therefore, cannot maintain the claim.  [Dkt. 21, p. 30-31].  The Plaintiff makes no response to the Defendants' motion for summary judgment.  As such, the Court may consider the claim abandoned.  *Albert v. City of Hartford*, 529 F. Supp. 2d 311, 328 (D. Conn. 2007) (considering claim abandoned when the plaintiff failed to address the claim in his opposition to summary judgment); *Santiago v. Newburgh Enlarged City School Dist.*, 485 F. Supp. 2d 327, 338 (S.D.N.Y. 2007) (dismissing the plaintiff's claim that she was fired in retaliation for complaining about discrimination because she failed to respond to the defendant's summary judgment argument); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal Courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way").  Even so, the claim fails on the merits as well.

In order to sustain a claim for negligent infliction of emotional distress, the plaintiff must allege that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm."  *Parsons v. United Tech. Corp., Sikorsky Aircraft Div.*, 243 Conn. 66, 88, 700 A.2d 655 (1997) (citations and internal quotation marks omitted).  In the employment context, a claim for

**46**

negligent infliction of emotional distress is only recognized "where it is based upon unreasonable conduct of the defendant in the termination process." *Perodeau v. City of Hartford*, 259 Conn. 729, 750, 792 A.2d 752 (2002) (citations and internal quotation marks omitted).  Accordingly, the dispositive issue is "whether the defendant's conduct during the termination process was *sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm."  *Id.* (citations and internal quotation marks omitted).  To rise to the requisite level, a plaintiff must allege more than "mere termination.  Rather, a complaint must allege . . ., for instance, that the actual termination was . . . done in an inconsiderate, humiliating, or embarrassing manner."  *Protasewich v. Combustion Eng'g, Inc.*, No. CV950552146S, 1997 WL 133499, at *6 (Conn. Sup. Ct. March 7, 1997).

Here, the Plaintiff has not alleged how the Board acted unreasonably as it relates to his termination.  On the contrary, the evidence shows that the Plaintiff was given notice, after participating in several disciplinary meetings, that his contract was being considered for termination.  That notice also permitted him the opportunity to request in writing the reasons that such action was being taken.  Furthermore, the Plaintiff was placed on administrative leave while the consideration was made and remained as such until the neutral arbiter decided in November 2012 that termination was appropriate.  There is nothing unreasonable about this process, and the Plaintiff has not raised any material issues of fact as related to the Board's involvement in the termination process that would rise to

47

the level of negligent infliction of emotional distress.  Accordingly, the Plaintiff's claim must fail.

### E.  Qualified Immunity

The Defendants argue that they are entitled to qualified immunity insofar as they are being sued in their official capacities.  [Dkt. 21, p. 27-28].  "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Zellner v. Summerlin*, 494 F.3d 34, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  The question is "what a reasonable person in the defendant's position should know about the constitutionality of the conduct."  *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999) (citations and internal quotation marks omitted).  In this Circuit, it "has long been clearly established that individuals have the right to be free from intentional race discrimination and retaliation in employment . . . ."  *DeNigris v. New York City Health & Hosps. Corp.*, 861 F. Supp. 2d 185, 196 (S.D.N.Y. 2012); *see also Grey v. City of Norwalk Bd. of Educ.*, 304 F. Supp. 2d 314, 331 (D. Conn. 2004) (finding that qualified immunity is no longer available for intentional race discrimination in the employment context which was decided by the Supreme Court as early as 1977); *Hill v. Taconic Developmental. Disabilities Servs. Office*, 283 F. Supp. 2d 955, 958 (S.D.N.Y. 2003) ("There can be

**48**

no doubt that the law barring discrimination against a person on the basis of race—including via a hostile work environment is 'well-settled.'"); *Griffin v. New York*, 122 Fed. App'x 533, 533 (2d Cir. 2004) ("Griffin's right to be free from these alleged adverse employment actions based on race was therefore clearly established, and the district court properly refused to grant qualified immunity at this time on defendants-appellants' summary judgment motion.").  Since this Court has already dismissed the claims related to discrimination and retaliation as to the individual Defendants, there is no need to address the qualified immunity issue.  If, however, there were material issues of fact that would lead to a trial on the retaliation and discrimination claims, the Court would deny the motion for summary judgment on the qualified immunity question because the right to be free from discrimination and retaliation in the workplace is clearly established, and a reasonable person would have known that engaging in such conduct would violate that clearly-established right.

### F.  Governmental Immunity

The Defendants also argue that the Board of Education is entitled to governmental immunity.  [Dkt. 21, p. 28-29].  "A board of education is an agency of the state in charge of education in a town."  *Mitchell v. King*, 169 Conn. 140, 146, 363 A.2d 68 (1975).

> Section 52–557n abrogates the common-law rule of governmental immunity and sets forth the circumstances in which a municipality is liable for damages to person and property. These circumstances include the negligent acts or omissions of the political subdivision or its employees or agents, negligence in the performance of functions from which the political

> subdivision derives a special corporate profit or
> pecuniary benefit, and acts which constitute the
> creation or participation in the creation of a nuisance . . .
> . [S]ection [52–557n (a)] goes on to exclude liability for
> acts or omissions of any employee or agent which
> constitute . . . negligent acts that involve the exercise of
> judgment or discretion . . . [Section 52–557n(b)] further
> sets forth ten other circumstances in which a
> municipality shall not be liable for damages to person or
> property.

*Segreto v. Bristol*, 71 Conn. App. 844, 850, 804 A.2d 928 (Conn. App. 2002)

(citations and internal quotation marks omitted), *cert denied*, 261 Conn. 941, 808

A.2d 1132 (2002).  The statute also excludes "acts or omissions of any employee,

officer or agent which constitute criminal conduct, fraud, actual malice or willful

misconduct."  Conn. Gen. Stat. § 52-557n(a)(2).  Since the substantive claims

have been dismissed in this case as to the Board of Education, the question of

governmental immunity need not be addressed.  However, assuming that one of

the claims against the Board of Education survives, governmental immunity

would only apply to claims based on negligent conduct.

   The Complaint alleges three counts against the Board of Education: negligent

infliction of emotional distress, racial discrimination in violation of Title VII, and

retaliation in violation of Title VII.  However, the Complaint and the facts brought

forth by the Plaintiff do not state what role the Board of Education allegedly

played in this case.  Therefore, it would be impossible without a clearer

understanding of the Board's role to determine if immunity would be available.

Even so, governmental immunity is not available for intentional conduct.  Indeed

"[a]s indicated in the language of the statute . . . § 52-557n applies only to claims

of negligence, not plaintiff's § 1983 claims alleging constitutional violations."

50

*Hughes v. City of Hartford*, 96 F. Supp. 2d 114, 119 (D. Conn. 2000).  Had a negligent count survived, governmental immunity might be available for the Board unless some other exception applied.

### IV.    Conclusion

For the foregoing reasons, Defendants' [Dkt. 20] Second Motion for Summary Judgment is GRANTED as to the plaintiff's claims under Title VII and 42 U.S.C. §§ 1981, 1983, and for the Plaintiff's claims for intentional infliction of emotional distress, and negligent infliction of emotional distress.  The defenses raised by the Defendants are moot as no claims remain extant.   The Clerk is directed to close this case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 24, 2014